**UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF MICHIGAN**
**SOUTHERN DIVISION**

ANTOINE JACKSON,

       Petitioner,

v.                                                    Case Number: 07-CV-14808
                                                      Honorable Gerald E. Rosen

JOHN PRELESNIK,

       Respondent.

_____/

**OPINION AND ORDER DENYING PETITIONER'S**
**PETITION FOR WRIT OF HABEAS CORPUS**

    Petitioner Antoine Jackson, a state inmate currently incarcerated in the Carson City

Correctional Facility in Carson City, Michigan, filed a *pro se* petition for a writ of habeas corpus

pursuant to U.S.C. § 2254, alleging that he is being held in violation of his constitutional rights.

On November 23, 2004, an Oakland County, Michigan, circuit court jury convicted Petitioner of

first-degree premeditated murder, MICH.COMP.LAWS § 750.316.  He was sentenced on

December 21, 2004 to life imprisonment without the possibility of parole.  In his *pro se*

pleadings, Petitioner asserts that the trial court erred in refusing to suppress his confessions and

that the prosecutor committed misconduct by vouching for the investigative detectives and by

improper argument.  Respondent filed his answer to the petition on May 14, 2008, and filed the

required Rule (5) materials on May 16, 2008.  For the reasons stated below, the Court denies the

petition.

**I.  Background**

    This case arises from the beating and asphyxiation death of Petitioner's seventy-nine-

year-old grandfather, Harvey Brooks, in his home on Timberline Street in Southfield, Michigan.

Trial began on November 16, 2004.

Officer David McCormick, a Southfield Police Officer working with the Directed Patrol Unit, testified first.  He said that he received a call from dispatch regarding a carjacking that occurred on December 2, 2002, at a bank on the border between Southfield and Lathrup Village, Michigan.  He was given a description of the car, a gray or silver Jeep, and the suspect's name, Antoine Jackson, who was the driver of the Jeep.  He testified that he was also informed that a possible victim was being held at a certain address on Timberline Street in Southfield.  Officer McCormick said that he subsequently received information that the suspect vehicle was heading in his direction.  He said that he attempted to block off the road, but the Jeep was able to swerve around the patrol car.  Officer McCormick and another officer then pursued the Jeep, but the driver continued to flee, traveling between fifty- to seventy-miles per hour in a forty-mile per hour zone.

Officer McCormick described the roads that day as snow-filled and very slippery.  He said that the vehicle ran two red lights, narrowly missed a number of vehicles, forced some vehicles off the road, and did not attempt to stop until it ran another red light and struck a car. The driver of the Jeep, later identified as Petitioner, got out of his car and started running. Officer McCormick, while in his patrol car, pursued Petitioner.  With the window rolled down, Officer McCormick told Petitioner to stop.  Petitioner stopped and was taken into custody.

When Petitioner was searched, Officer McCormick found a number of Brooks's articles in his pockets: (1) a Marshall Fields' charge card, (2) a Chrysler retirement card, (3) an affidavit from a bank made by Brooks, reporting an unauthorized signature used against his account, (4) a forgery questionnaire for a bank account, (5) miscellaneous bank paper work, and (6) newspaper

2

articles which indicated that Brooks had been awarded two and a half million dollars for a work-related injury which had resulted in the loss of his arm.  On the forgery questionnaire, it asked Brooks who he believed was responsible for the unauthorized signature.  Brooks wrote, "Yes.  My grandson Antoine Jackson."  Trial Tr. vol. I, 164, Nov. 16, 2004.  Officer McCormick also looked in the Jeep and saw a can of Raid and a bag that contained some type of restraints.

Officer William Smarsty testified next.  He said that he was on duty on December 2, 2002, and was sent to an address on Timberline; he was not involved in the carjacking pursuit.  He said that, during the same period of time that Petitioner was leading the police in a chase, other officers were responding to the Timberline address to look for a victim, possibly tied up, and for a possible second armed suspect, related to the carjacking.  According to Officer Smarsty's testimony, he and six other officers entered the home.

Officer Smarsty testified that the door to the house was unlocked and the house itself did not appear to be in disarray.  Officer Smarsty said that he saw some blood in one of the bathrooms, and then, after approximately three sweeps of the house, he found Brooks's body in the master bedroom, wedged under the headboard of the bed.  It was Officer Smarsty's position that the bed was so low to the ground that he could not believe that it was possible that someone could be under the bed.  Officer Smarsty said that the victim was clearly deceased, cold to the touch with no vital signs.

Sergeant Michelle Kuzila testified next.  She processed the house and the Jeep for evidence.  Sergeant Kuzila testified that she searched the Jeep and found a driver's license registered to Brooks in the cup holder.  According to Sergeant Kuzila, the vehicle was registered both to Brooks and Valerie Moore, his girlfriend.  In the bookbag found in the car, she noted a

3

pair of toy hand-cuffs, the packaging for another set of cuffs, handcuff keys, plastic restraints, a cell phone, one brown work glove, two unsigned loose checks, a to-do list, and garbage bags. Sergeant Kuzila testified that four of Petitioner's fingerprints were identified on the to-do list. The account holders on the checks were Brooks and Moore. One of the checks appeared to have a bloody fingerprint in the corner. Moore's blood was later identified as having the same DNA profile as the blood on the check. Her fingerprint was also positively identified as consistent with the one found on the check. A wallet with Petitioner's temporary driver's license and social security card was also found in the bag.

Sergeant Kuzila also testified that she found a pair of hand-cuffs, a can of Raid, another brown work glove, and a pair of boots on the floor of the car. She said that she discovered a jacket on the front passenger seat with Petitioner's identification card as well as his Baker College identification card inside. In the backseat, Sergeant Kuzila found a checkbook with several checks in it. Some loose checks from that checkbook were located loosely in the bag. The signature line was filled out with Brooks's signature on a couple of the checks. The address of the account holders was consistent with the address where the victim's body was later found. Sergeant Kuzila also seized a nylon scarf from the passenger floorboard, which appeared to have bloodstains on it.

Sergeant Kuzila said that, in the house, she discovered a pillowcase and a comforter which appeared to have some bloodstains. The pillowcase was near a chair and the comforter was on the lower half of the bed.

The stains field-tested positive for blood and the DNA was eventually analyzed and found to be consistent with the victim's blood. There were also bloodstains on the carpet. There

4

was a

box of checks in the armoire cabinet and a check register on the floor next to the armoire which was located next to the bed.  The check register had bloodstains on it.

Sergeant Kuzila also testified that the sink attached to the bedroom appeared to have been used.  She said that there were bloodstains in the sink which were consistent with that of someone washing his or her hands.  Immediately outside the sink area, on the floor, were more bloodstains, which were consistent with dripping hands as if someone were searching for a towel. Those stains were also diluted.  The DNA profile of the blood matched that of Moore.  There was also a palm print on the bathroom sink consistent with the victim's.  Sergeant Kuzila also found a knit cap, with two hand-made eyeholes cut into it and some black curly hair next to the cap, on a sink in another bathroom.

According to Sergeant Kuzila, a small boning knife was found on a dresser in another bedroom.  In the kitchen, Sergeant Kuzila collected two acrylic fingernails from the floor, one of which had been broken.  In the trash can in the kitchen, Sergeant Kuzila observed several plastic bags with bloodstains on them.  Some of the plastic bags were consistent with the plastic bags which had been found in the Jeep.

Dr. Bernardino Pacris, the Deputy Chief Medical Examiner who performed Brooks's autopsy, testified next.  He said that the victim had been 5'4" and 113 pounds and one of his arms had been previously amputated at the elbow.  The doctor noted some injuries to the face, chest and extremities.  He also noted petechiae, pinpoint hemorrhages, as well as ecchymosis, larger hemorrhages, in the skin surrounding the eyes.  The hemorrhaging he observed was consistent

with asphyxia.  He also noted hemorrhaging in the tongue, the neck muscle, epiglottis, the thyroid gland, and under the skull.  According to Dr. Pacris, the hemorrhaging in the tongue and under the skull could have been caused by asphyxia or by blunt force trauma.  However, the injury under the skull was not consistent with a fall because there were too many points of impact.  The hemorrhaging in the neck was consistent with strangulation by means of neck compression.  Dr. Pacris noted bruising in the lower chest area and abrasions on the right shoulder, knees, and right elbow.  He observed congestion in the lungs which was consistent with suffocation.

According to Dr. Pacris, the appearance of the brain revealed that asphyxiation would have taken at least twenty minutes.  It was Dr. Pacris's opinion that Brooks died due to asphyxia, a result of oxygen deprivation, and which is consistent with having been caused by an arm around the neck and a hand over the mouth and nose.  He labeled the death as a homicide.

Detective Michael Krause testified that, on December 2, 2002, the Southfield Police Department received a report of a silver Jeep that was taken in a carjacking outside of a bank in the City of Lathrup.  Detective Krause testified that he initially responded to the scene of the carjacking and spoke to Ms. Valerie Moore, who gave her name as Valerie Rogers.  Ms. Rogers stated that, in addition to her car being hijacked, she had been beaten with a gun by two gunmen, as well as run over by a car.  She told him that there might be another person who was tied up at an address on Timberline in Southfield, Michigan.  Detective Krause said that Ms. Rogers described the vehicle that had been carjacked as a white Jeep Liberty, with a black male driver.

Dr. Ljubisa Jovan Dragovic, an expert in neuropathology as well as forensic pathology, testified that he observed hypoxia in the victim's brain which would indicate that the victim

6

survived at least fifteen to twenty-five minutes while being suffocated.  It was his impression
that the hypoxia indicated that the victim's supply of air was cut off intermittently which would
be consistent with a prolonged struggle.  Dr. Dragovic also stated that the hemorrhaging in the
eyes and neck area was consistent with intermittent pressure on the neck during a struggle.  Dr.
Dragovic concurred with Dr. Pacris's finding that the victim had died of asphyxia with some
blunt-force trauma to the head.

Detective James Dziedzic reviewed the video-tape from the bank where the Jeep was
reportedly carjacked.  He saw Petitioner and Moore entering the bank at 12:43 p.m. on
December 2, 2002, and Moore going to the customer service counter.

Detective Darrell Palmer, from the Southfield Police Department, was the officer-in-
charge of the case.  He testified that he interviewed Petitioner three times, twice on December 2,
2002, following Petitioner's arrest, and once on December 3, 2002, and obtained statements each
time.  Additionally, a fourth statement was obtained by Detective Stephen Schneider on
December 4, 2002.  Prior to trial, a *Walker*[1] hearing was held to determine the admissibility of
those statements to the police.  The trial court determined that the statements were voluntarily
and knowingly made.  Petitioner's statements to the police were therefore admitted at trial.

### A.  First statement

Detective Palmer testified that the first time he had contact with Petitioner was at the
police station at about 2:30 or 3:00 p.m. on December 2, 2002, after his arrest.  He said that
Detective Lawrence Jones was also present.  Detective Palmer said that, before he read Petitioner
his rights, he filled out an informational form.  On that form, Petitioner indicated that he was

---

[1]*People v. Walker (On Reh'g)*, 374 Mich. 331; 132 N.W.2d 87 (1965).

7

nineteen-years old, 4'11" tall, 100 pounds, finished high school and was attending Baker College.

Detective Palmer said that Petitioner appeared to be in a normal frame of mind.  He did not appear to be sleep-deprived and did not appear to be under the influence of any substances. He also answered the questions appropriately.  Detective Palmer said that Petitioner waived his *Miranda*[2] rights in writing and agreed to speak with them.  Petitioner initialed every right after it was read to him; he read it to himself, and he indicated to the Detective that he understood it. Detective Palmer also said that he was given a soda during the course of the interview.

Detective Palmer then read Petitioner's statement into the record.  A summary of that statement follows:

In his written statement Petitioner stated that he went over to his grandfather's house at 2300 Timberline on December 1, 2002 at about 9:30 in the evening with the intent to "draw" his grandfather's girlfriend over the next day in order to get some money from her.  Trial Tr. vol. II, 248, Nov. 18, 2004.  Petitioner said that he planned to unplug the phone, so when his grandfather's girlfriend, Valerie Moore, called, he wouldn't answer the phone, and she would then come over to the home to check on his grandfather.  Petitioner said that instead, the next morning, December 2, 2002, his grandfather woke him up and asked him to leave.  Petitioner said he was tired and didn't leave.  He wrote that he decided to stay awhile longer to see if Moore was going to show up.

According to Petitioner's first statement, Moore eventually came over and talked to his grandfather for awhile, in the bedroom.  As she was exiting the bedroom, Petitioner said she

_____

[2]*Miranda v. Arizona*, 384 U.S. 436 (1966).

"cocked her hands up" and Petitioner took his arm and wrapped it around her head and took her into the kitchen on the floor.  Trial Tr. vol. II, 248, Nov. 18, 2004.  Petitioner said that he had some Raid nearby and sprayed her in the eyes and mouth.  He also grabbed some utensils out of the drawer to scare her.  Petitioner wrote that he then asked Moore why she was taking all of his grandfather's money and asked her what she was doing with the money that she had received.

According to Petitioner, Moore then realized that he was more interested in the money than hurting her, and told him that his grandfather had been receiving money from an insurance company and that she would be willing to give him $100,000 over a period of days.  She then picked up his grandfather's ID and gave it to him.  Petitioner wrote that he was only interested in revenge.  He said that he then changed his mind and told Moore that they were going to the bank to get the money.  They then left in Moore's Jeep but had to stop for gas.

Petitioner said that at one point when he stopped, Moore got out of Jeep and attempted to use the snow to wipe off the blood that was on her hands.  Petitioner said that Moore's finger had started bleeding after her fingernail got ripped off during the struggle with him in the kitchen.

Once they got to the bank, Petitioner wrote that Moore obtained some withdrawal slips and asked him how much he needed.  Petitioner wrote that Moore then grabbed the keys out of the ignition and said that he wasn't going anywhere.  Petitioner said he grabbed the keys back from her, but she jumped out of the vehicle.  Petitioner wrote that he told her to get back in the car but when she wouldn't, he pulled away, hitting her with the door.

Petitioner said he then decided to return to his grandfather's house.  He said that, after he pulled into the driveway, he heard "a bunch of police cars."  Trial Tr. vol. II, 252, Nov. 18, 2004.  Petitioner said he gathered his belongings from the home and left.  He wrote that he panicked

9

once he saw the police cars, sped up, and crashed.  Petitioner concluded by writing, "My whole

intent out of the situation was to have Valerie give back what was rightfully my family [sic]."

Trial Tr. vol. II, 252-53, Nov. 18, 2004.

Petitioner signed the statement.  At the bottom of the statement, the time was given as

5:50 p.m. on December 2, 2002.

Afterward, Detective Palmer gave Petitioner a series of written questions for him to

answer in writing:

> Q.    We found handcuffs in the Jeep.  What did you use them for?
> A.    I used the handcuffs to handcuff Valerie on the floor in the
>       kitchen at my grandfather's house.  A.J. [Petitioner's initials]
> Q.    What time did your grandfather tell you to leave his home on 12/2/02?
> A.    Between 10:30 a.m. and 11:00 a.m.  A.J.
> Q.    What utensils did you grab out of the drawer in the kitchen?
> A.    A Fork, A Spoon, A butter Knife.  A.J.

### B.  Second statement

Detective Palmer stated that after he received those statements from Petitioner, he and

Detective Jones talked to other police officers, who were gathering information regarding the

homicide, including statements from Moore.  Once they had gathered more information,

Detective Palmer testified that he and Detective Jones decided to re-interview Petitioner at

around 6:30 or 6:45 p.m., on the same day.

Petitioner had remained in the interview room in the interim.  Detective Palmer told

Petitioner that he did not believe what he had told the police the first time especially because he

did not mention that his grandfather was dead.  Initially, Petitioner responded that he had been

truthful with the police, but then he admitted that he had not been telling the truth.  Petitioner

then gave another verbal statement followed by a written statement and again responded in writing to written questions.  The following summarizes what occurred.

During the interview Petitioner explained that the plan to obtain money from his grandfather had originated with him and his cousin Demetrius Brooks, two days prior to the incident, the last day of November 2002.  He said that when he arrived at his grandfather's home on Sunday evening, Demetrius was already there.  He said he could hear his grandfather in the back room singing.  He said that a friend of his, Lavell Riddle, arrived around 2:00 a.m.  He said the plan was to unplug the phones so Moore would eventually end up at the home in the morning.

Petitioner said that when Moore arrived the following morning, he attacked her by spraying her with Raid and striking her.  He handcuffed her in the kitchen area.  He said that Demetrius Brooks and Lavell Riddle were with his grandfather while this was occurring.  He claimed he told Moore that his grandfather was at the store with Demetrius Brooks.  He said that he and Moore eventually went to the bank to attempt to obtain money from his grandfather's account.  He said Moore told him that she would give him $3,000 over a period of a couple days.

Once at the bank, they got the withdrawal slip, but then he and Moore got into an argument about how much money she should withdraw.  This argument led to Moore getting out of the vehicle and screaming for help.  Petitioner said he then left the bank in her Jeep.

Petitioner told the Detectives that he then went home and got his personal possessions, but claimed that he did not see his grandfather.  Petitioner again wrote a statement reiterating much of what he had told the detectives:  He wrote that he and his cousin Demetrius Brooks

11

planned to go to his grandfather's home to get some money from Moore.  At around 10:45 p.m. on Sunday evening, he went over to his grandfather's home with his belongings.  Petitioner said that Demetrius Brooks was already there.  Petitioner said that Demetrius told him to be quiet because he did not want his grandfather to know that he was in the home.  Petitioner wrote that he was talking with Demetrius about their plan to get money from Moore but claimed that Demetrius kept walking in and out of his grandfather's bedroom.

Petitioner said that he went to sleep after Lavell [Riddle] had come over at around 2:00 a.m.  He said that after he woke up the next morning, he heard the phone ring continuously and believed that it was Moore calling.  Petitioner said that Moore then showed up and they fought in the kitchen.  He said that after the fight he and Moore went to the bank to try to get some money.  He said that when he returned from the bank Demetrius and Lavell were gone.  Petitioner signed the second statement at 7:30 p.m. on December 2nd.

Detective Palmer then asked Petitioner written questions which Petitioner also responded to in writing, including initialing every answer after he wrote it.  That question and answer session concluded on December 2nd, around 7:45 p.m.  Petitioner was then lodged in the jail where he was held until the next day.

### C.  Third statement

The following day, around 9:00 p.m., Petitioner was re-interviewed by Detective Palmer, this time accompanied by Detective Dziedzic.  By that time, Demetrius Brooks and Lavell Riddle had been arrested and interviewed and the autopsy of the victim had been conducted.  After Demetrius Brooks and Lavell Riddle had been interviewed, they were released.

The detectives advised Petitioner that they wanted to speak with him regarding the

statements he had made the day before; Petitioner willingly agreed to speak with them.

Petitioner was coherent, could carry on a conversation, and did not appear to be upset.  The

detectives advised Petitioner that they did not believe what he told them the previous day.

Detective Palmer said that the police knew about his grandfather's injuries as well as other

information which they had discovered during the course of the investigation.  Petitioner then

said he would tell them what really happened at his grandfather's house.

Petitioner said that he arrived at his grandfather's home the evening of December 1st and

there was no one there except himself and his grandfather.  He said he looked in the refrigerator

but did not find anything in there to eat.  He said he then went back to his grandfather's bedroom

and asked his grandfather what he had been eating since his surgery.  His grandfather told him

not to worry about what he had been eating, but that Petitioner should worry about getting a job.

Petitioner said that the discussion turned into an argument.

He said he was angry with his grandfather about several issues, including the fact that his

grandfather believed that he had been taking money from him.  His grandfather had accused

Petitioner of writing a check on his account, without his permission.  Petitioner claimed

that during that argument his grandfather tripped and fell over a ceramic elephant in the

bedroom. Petitioner said he fell on his grandfather.

The detectives then confronted Petitioner with the autopsy findings, and Petitioner

changed his story.  He then said that he had struck his grandfather three times with a closed fist

on the top of his head, and then struck him in the face two or three times.  His grandfather then

went into the bathroom, came out, and fell on the floor.  Petitioner said he then pulled his

grandfather into his lap, placed his right arm around his neck and left hand over his throat and

13

applied pressure.  He said he choked his grandfather for about a minute.  Petitioner said that after

the altercation, he panicked, paced the floor, and finally went to bed around 2:00 a.m.

Petitioner said that when he awoke at around 10:30 a.m. the phone was ringing.  He said

that he again panicked because he believed it was Moore calling, so he went into his

grandfather's room and stuffed the body under the bed.  Shortly thereafter Moore arrived and

they had an altercation in the kitchen where he sprayed her with Raid, handcuffed her, and put

her on the floor.

Petitioner then gave a written statement which encapsulated much of what he had told the

police in his third interview.  He said he went over to his grandfather's home on Sunday evening

at about 10:45 p.m.  When his grandfather opened the door, he asked why Petitioner was there

and Petitioner told his grandfather that he was waiting for Demetrius.

Petitioner said he went to the refrigerator to get a snack but there was nothing in there

that he wanted to eat so, he went and asked his grandfather what he had been eating since his

surgery. His grandfather told him not to worry about what he ate but to worry about getting

himself

together and to stop taking money from people.  Petitioner wrote that he and his grandfather then

got into an argument about how Petitioner had written a check for $325.

Petitioner confronted his grandfather about his grandfather giving things to Moore but

not giving things to his own family.  His grandfather then told Petitioner that he and Moore were

going to get married and then he wouldn't have to worry about his family, and that Petitioner

should mind his own business.  Petitioner wrote that he became upset and hit his grandfather on

top of the head and face several times.  Petitioner said that he released his grandfather after his

14

grandfather told him he had to use the bathroom.  He said that when his grandfather came out of the bathroom, he fell to the floor.  He said he then went down to the floor and pulled his grandfather's head into his arms.  Petitioner said that he saw blood coming out of his grandfather's ear, dripping onto a pillow which his grandfather had pulled onto the floor.  Petitioner then wrote that he had his left arm around his grandfather's neck and his right hand over half of his grandfather's mouth.  He alleged that he panicked and got up.  Petitioner claimed that he heard his grandfather cough a couple times thereafter.

Petitioner then wrote that he went into another bedroom and eventually went to sleep.  He said that he was awakened around 11:00 a.m., by the phone, which he knew was Moore calling.  Petitioner wrote that he went to check on his grandfather but didn't hear his heart beating or feel a pulse.  He then said that, knowing that Moore was on her way, he hid his grandfather's body under the bed.

Petitioner wrote that he then told the detectives that Moore entered the home, asking why his grandfather wasn't answering the phone.  He said that he told her that his grandfather was out with Demetrius.  Petitioner said that they then got into an argument; he grabbed her, sprayed a can of Raid into her eyes and mouth, and handcuffed her.  Petitioner said that he then tried placing a black grocery bag over her head.  Petitioner then removed the bag and started asking her why she was involved with his grandfather, why the home had been placed in her name, and other questions regarding his grandfather's finances.

He then un-cuffed Moore since she appear calmer.  She then asked him what he wanted.  Petitioner told her that he wanted her name off of everything his grandfather owned.  She then asked him if he wanted some money.  Petitioner alleged that he told her he didn't want money;

15

he just wanted her to leave his grandfather alone.  Petitioner then accused Moore of taking more of his grandfather's belongings.  Petitioner wrote that Moore suggested that they get his grandfather's checkbook and identification so they could get some money.  They then drove to the bank where she jumped out.  Petitioner said that he then left, went back to his grandfather's house and gathered up his things.

Petitioner wrote that once he came in contact with the police, he panicked and had an accident.  Petitioner signed the statement about 1:00 a.m. on December 4, 2002.  Petitioner was then re-lodged in the jail.  That interview began about 9:00 p.m. and ended about 1:00 a.m.

### D.  Fourth statement

The next day, December 4, 2002, when Detective Palmer was presenting the warrant to the prosecutor's office, one of the prosecutors had a few more questions that he wanted to ask Petitioner.  Petitioner had been lodged in the jail and was then brought back to the interview room.  Detective Stephen Schneider, also from the Southfield Police Department, then asked Petitioner some additional questions; the time was around 2:00 p.m.

Detective Schneider said that Petitioner did not appear upset.  However, because he was thirsty, Detective Schneider provided him with a couple of Cokes and Doritos.  Petitioner appeared to understand what was taking place and Detective Schneider re-advised Petitioner of his *Miranda* rights.

The Detective read through the *Miranda* form, had Petitioner read it, and initial each right.  Petitioner stated he was willing to waive his rights, wanted to cooperate, and consequently signed the form.  During this session, the Detective asked Petitioner questions orally and in writing and Petitioner responded both verbally and in writing:

16

Q.      Did you see Demetrius Sunday night 12/1/02, at your grandfather's house?
A.      No.
Q.      Was Demetrius or Lavell at your grandfather's house Monday at any time?
A.      No.
Q.      Was the check you mentioned for $325.00 from your grandfather's account?
A.      Yes.

Q.      Did the argument start between you and your grandfather over the check or Valerie taking all his money?
A.      The argument started over Valerie taking all his money.
Q.      How did the physical altercation between you and your grandfather begin?
A.      My grandfather pushed me with his hand and told me to leave.
Q.      When you struck your grandfather, were your hands open or in a fist?
A.      My hands were both open and closed.
Q.      When your grandfather walked into the bathroom, could you tell if he was injured or bleeding?
A.      From my perspective I didn't see my grandfather bleeding but I did notice he happened to start coughing more than usual.
Q.      Did you see him fall to the floor?
A.      When my grandfather was trying to get in the bed, he reached on the bed pulling a pillow down with him on the ground.
Q.      Could you see if he struck his head on anything as he fell?
A.      No, I didn't see him strike his head on anything as he fell.
Q.      Did you attempt to help him once you saw him fall?
A.      For several seconds I stood there in the hallway by the bedroom door to see if maybe he would get up and then I sat down on the floor where he laid on the pillow and lifted his head up with my arm around his neck and my hand over half his mouth rocking back and forward hoping that he was alright.
Q.      Could you tell if he was breathing?
A.      No, I couldn't tell if he was breathing or not but after a while of me holding my grandfather he was making a cough-like noise which at that time indicated to me that he was OK until I had looked on the pillow and there happened to be blood on the pillow with his ear bleeding.
Q.      Was your hand covering his whole mouth or just part of it?
A.      I can remember me holding my grandfather with my right hand over his mouth and some of his nose.
Q.      Where was he lying when you left him?
A.      He was lying between the night stand and the bed.
Q.      Did you ever place tape over his mouth or tie him up?
A.      No, I never placed tape over his mouth nor did I tie my grandfather up.
Q.      Did you assume he was sleeping when you left him?

17

A.     I assumed that my grandfather happened to pass out or something

Q.     Was he still in the same position you last saw him, the next morning?

A.     Yes, my grandfather appeared to be in the same position in which he was the night before.

Q.     When did you realize he was dead?

A.     When I was woke by the telephone the next morning I looked outside my bedroom and realized that he didn't happen to move so I ran in the room to check his heart beat and pulse and I didn't get any type of response.

Q.     Did you think to call 911 for help?

A.     I didn't know what to do.  I didn't know whether to call 911 or someone in the family or whatever.  I began panicking when I realized he didn't move.

Q.     Did anyone help you hide your grandfather under the bed's headboard?

A.     No, no one helped me hide my grandfather under the headboard.

Q.     When Valerie came over that morning was she alone or with someone?

A.     Valerie was alone in the house with me.

Q.     Was your grandfather's body already hidden, when Valerie arrived?

A.     Yes, my grandfather's body was already hidden when Valerie arrived.

Q.     Do you know anyone by the name of Sharon Whitehead or Sly?

A.     No, I have no idea as into [sic] who of these individuals are.

Q.     Did you see anyone else outside the house when Valerie arrived?

A.     No, I didn't see anyone else outside the house when Valerie arrived.

Q.     Do you see a white car in the driveway of your grandfather's house at any time?

A.     No, there was no other car in the driveway besides Valerie and my grandfather's silver Liberty.

Q.     When you left the house with Valerie, was she handcuffed?

A.     No, Valerie was not handcuffed while exiting the house.

Q.     When you first got into the Liberty at your grandfather's house, did anyone else get in the Liberty with you and Valerie?

A.     When I shut the door on the garage I happened to be the last person getting
in the car and seeing whom all was in the vehicle.  While entering
the Liberty on the driver side I saw Valerie sitting on the passenger side
and she was the only person in the car.

Q.     At any time during this whole ordeal was Demetrius Brooks or Lavell Riddle involved or at your grandfather's residence?

A.     During this whole ordeal Demetrius Brooks and Lavell Riddle were nowhere in the house or around the house.

Q.     Did you have a gun or force Valerie to withdraw money from your grandfather's account?

A.     No, I didn't force Valerie into the car to go to the bank to withdraw money.  Nor did I have a gun or knife to her and force her to get money.

Q.     Have you given these statements on your own free will?

A.     Yes.

18

Q.      Have you been treated fairly today by Detective Schneider?
A.      Yes.
Q.      Is there anything else you would like to add today?
A.      It wasn't my intent at all for this altercation to go this far.  I'm terrible
        sorry for the accident with my grandfather but I'm not sorry about the
        whole incident with Valerie.  I always looked up to my grandfather and
        admired what he did do for the family before my grandfather died.  He
was
        a great man that inspired me in many ways spiritually.  I just wish the
        outcome of this incident will be OK.

Petitioner signed his answers with the date December 4, 2002.  The interview lasted from

2:00 p.m. until 3:20 p.m.

After Detective Schneider's testimony, the prosecution rested.

Valerie Moore testified for the defense.  She said that she was also known by her maiden

name, Valerie Rogers, and by another one of her married names, Valerie Williams.  Moore

testified that the victim had been the conservator of her money and they had joint accounts.  She

also listed the victim's address as her address on her driver's license.  Moore said that on

December 2, 2002, she had been carjacked by Petitioner and reported the carjacking at the bank.

She said she assumed Petitioner had a gun since she had seen a silver object but was not sure.

She also told the police that she and Petitioner had struggled over a butter knife and she

was cut while she was at Timberline and had been sprayed with Raid.  She said she was hit by

the car when Petitioner took off at the bank.  She told the police, because she wasn't supposed to

be driving a car, that a woman by the name of Sharon Whitehead had originally driven her over

to the victim's residence, which was not true.

Moore further testified that she told the police that the victim had been tied up.  She

admitted that when she initially called the police she did not give Petitioner's name.  She said

19

she had seen Demetrius Brooks and Lavell Riddle with the victim in the bedroom.  She also

claimed that she thought the victim was alive when she and Petitioner left the home.  She

testified that she later apologized for lying on Demetrius and Lavell and admitted that she did not

actually see

Demetrius and Lavell in the home at any time and had not seen the victim at all that morning,

much less tied up.  However, she said she solely relied on what Petitioner had said.

   The jury found Petitioner guilty as charged.

   Subsequently, Petitioner, through appointed counsel, filed a first right of appeal in the

Michigan Court of Appeals, raising the following claims:

> I.   The trial court's refusal to suppress Mr. Jackson's confession was clearly
> erroneous and a deprivation of Mr. Jackson's state and federal rights
> against involuntary self-incrimination and due process of law.

> II.   Mr. Jackson was denied his Sixth and Fourteenth Amendment rights to a
> fair trial and due process of law through misconduct of the prosecutor,
> which consisted of improper argument and vouching for the investigating
> detectives.

   On September 19, 2006, the Michigan Court of Appeals issued an unpublished *per

curiam* opinion affirming Petitioner's convictions.  *People v. Jackson*, No. 260820, 2006 WL

2683726 (Mich.Ct.App. Sept. 19, 2006).  Petitioner then filed an application for leave to appeal

that decision in the Michigan Supreme Court, raising the same claims as were raised in the

Michigan Court of Appeals.  On December 28, 2006, the Michigan Supreme Court denied

Petitioner's application.  *People v. Jackson*, 477 Mich. 975, 725 N.W.2d 45 (2006).

   On October 25, 2005, Petitioner filed the pending petition for a writ of habeas corpus,

presenting the same claims as presented in both state appellate courts.

## II.  Standard of Review

The Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA) governs this

court's habeas corpus review of state-court decisions.  Specifically, 28 U.S.C. § 2254(d) states in

pertinent part:

> (d) An application for a writ of habeas corpus on behalf of a person in custody
> pursuant to the judgment of a State court shall not be granted with respect to any
> claim that was adjudicated on the merits in State court proceedings unless the
> adjudication of the claim–
>
> (1) resulted in a decision that was contrary to, or involved an unreasonable
> application of, clearly established Federal law, as determined by the Supreme
> Court of the United States; or
>
> (2) resulted in a decision that was based on an unreasonable determination of the
> facts in light of the evidence presented at the State court proceedings.

Under (d)(1), a federal court may grant a writ of habeas corpus under two different

clauses, both of which provide two bases for relief.  Under the "contrary to" clause, a federal

court may grant habeas relief if the state court arrives at a conclusion opposite to that reached by

the Supreme Court on a question of law or if the state court decides a case differently than the

Supreme Court has decided on a set of materially indistinguishable facts.  *Williams v. Taylor*,

529 U.S. 362, 405-06 (2000).  The words "contrary to" should be construed to mean

"diametrically different, opposite in character or nature, or mutually opposed."  *Id.*

Under the "unreasonable application" clause, a federal court may grant habeas relief if

the state court identifies the correct governing legal principle from the Supreme Court's

decisions but unreasonably applies that principle to the facts.  *Williams*, 529 U.S. at 407-08.

Relief is also available under this clause if the state-court decision either unreasonably extends

or unreasonably refuses to extend a legal principle from Supreme Court precedent to a new

21

context. *Id.* at 407; *Arnett v. Jackson*, 393 F.3d 681, 686 (6th Cir. 2005). The proper inquiry for the "unreasonable application" analysis is whether the state-court decision was "objectively unreasonable" and not simply erroneous or incorrect. *Williams*, 529 U.S. at 407; *Lordi v. Ishee*, 384 F.3d 189, 195 (6th Cir. 2004).

In analyzing whether a state-court decision is "contrary to" or an "unreasonable application of" clearly established Supreme Court precedent, a federal court may only look to the holdings, as opposed to dicta, of the Supreme Court's decisions as of the time of the relevant state-court decision. *Lockyer v. Andrade*, 538 U.S. 63, 71 (2003); *Williams*, 529 U.S. at 412.

With that standard in mind, the Court proceeds to the merits of the petition for a writ of habeas corpus.

### III.  Discussion

### A.  Suppression of Statements

Petitioner first contends that the trial court committed error when it failed to suppress his confessions.

The Fifth Amendment privilege against compulsory self-incrimination bars the admission of involuntary confessions against the accused. *Colorado v. Connelly*, 479 U.S. 157, 163-164 (1986). Additionally, in *Miranda v. Arizona*, 384 U.S. 436 (1966), the United States Supreme Court held that the privilege against self-incrimination not only protects individuals from compulsion to testify in a criminal courtroom, but also from "informal compulsion exerted by law-enforcement officers during in-custody questioning." *Id.* at 461. A custodial interrogation means questioning initiated by the police after the person has been taken into custody or otherwise deprived of his freedom of action in any significant way. *Id.* at 444. "[T]he initial

22

determination of custody depends on the objective circumstances of the interrogation, not on the subjective views harbored by either the interrogating officers or the person being questioned." *Stansbury v. California*, 511 U.S. 318, 323 (1994).

To protect the right against self-incrimination of a person in custody, the Supreme Court determined that "[p]rior to any questioning, the person must be warned that he has a right to remain silent, that any statement he does make may be used as evidence against him, and that he has a right to the presence of an attorney, either retained or appointed." *Pennsylvania v. Muniz*, 496 U.S. 582, 589 (1990) (citing *Miranda*, 384 U.S. at 444). Unless the suspect knowingly, voluntarily, and intelligently waives these rights, any incriminating responses to the questioning will be excluded. *Id.*

*Miranda* rights may be waived only if the waiver is voluntary, knowing, and intelligent; that is, the product of free choice rather than intimidation, and with full awareness of the nature of the right being relinquished and the consequences. *Moran v. Burbine*, 475 U.S. 412, 421 (1986); *Machacek v. Hofbauer*, 213 F.3d 947, 954 (6th Cir. 2000). Whether such a waiver occurred is determined under the totality of the circumstances. *Moran*, 475 U.S. at 421; *Abela v. Martin*, 380 F.3d 915, 928 (6th Cir. 2004). In *Moran*, for example, the Court stated:

> The inquiry has two distinct dimensions. First, the relinquishment of the right must have been voluntary in the sense that it was the product of a free and deliberate choice rather than intimidation, coercion, or deception. Second, the waiver must have been made with a full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it. Only if the "totality of the circumstances surrounding the interrogation" reveal both an uncoerced choice and the requisite level of comprehension may a court properly conclude that the *Miranda* rights have been waived.

*Moran*, 475 U.S. at 421 (Citations omitted).

23

Whether a suspect's waiver of *Miranda* rights is "a knowing and intelligent relinquishment or abandonment of a known right or privilege" is "a matter which depends in each case 'upon the particular facts and circumstances surrounding that case, including the background, experience, and conduct of the accused.'" *Edwards v. Arizona*, 451 U.S. 477, 482 (1981) (quoting *Johnson v. Zerbst*, 304 U.S. 458, 464 (1938)).  A court must examine the "totality of the circumstances" to determine whether a suspect's waiver was knowing and intelligent, including inquiries into the suspect's "age, experience, education, background, and intelligence, and into whether he has the capacity to understand the warnings given him, the nature of his Fifth Amendment rights, and the consequences of waiving those rights." *Fare v. Michael C.*, 442 U.S. 707, 725 (1979).  "The Constitution does not require that a criminal suspect know and understand every possible consequence of a waiver of the Fifth Amendment privilege," but does require "that a suspect know [] that he may choose not to talk to law enforcement officers, to talk only with counsel present, or to discontinue talking at any time." *Colorado v. Spring*, 479 U.S. 564, 574 (1987) (citing *Moran*, 475 U.S. at 422) (the waiver must have been made with a full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it).

Additional factors to be considered by a court should include (1) police coercion; (2) length of interrogation; (3) location of interrogation; (4) continuity of interrogation; (5) the suspect's maturity; (6) the suspect's education; (7) the suspect's physical condition and mental health; and (8) whether the suspect was advised of *Miranda* rights.  *Withrow v. Williams*, 507 U.S. 680, 693-94 (1993).  However, if the *Miranda* rights are properly given and invoked, the accused can still waive his rights.  His responses to questions can be admitted at trial only on the

finding that the accused: (a) initiated further discussions with the police, and (b) knowingly and intelligently waived the rights he had invoked. *Smith v. Illinois*, 469 U.S. 91, 95 (1984). It is pivotal, however, to determine who initiates further discussion after *Miranda* rights are invoked. If the police initiate the discussion, such discussion is constitutionally prohibited even if it concerns an entirely different criminal investigation, and even where the defendant executes a waiver and his statements would be considered voluntary under traditionally standards. *Minnick v. Mississippi*, 498 U.S. 146, 151-54 (1990). This is so because the Fifth Amendment *Miranda* rights are non-offense-specific, and are designed to protect the defendant's right against self-incrimination during all police interrogations. *McNeil v. Wisconsin*, 501 U.S. 171, 177 (1991).

However, if the suspect is not in continuous custody, re-initiation of questioning by the police without the presence of counsel is not prohibited. *Kyger v. Carlton*, 146 F.3d 374, 380-81 (6th Cir. 1998). Also, if the suspect has only invoked his right to remain silent, and not his right to counsel, he may later be questioned about different crimes. *Arizona v. Roberson*, 486 U.S. 675, 683 (1998).

The question here is whether the totality of the circumstances showed that Petitioner knowingly and intelligently waived his *Miranda* rights before speaking to the police.

The last court to issue a reasoned decision in this case regarding this issue, the Michigan Court of Appeals, stated:

> Defendant first argues that the trial court erred in denying his motion to suppress his statements to the police. Defendant maintains that his statements were not made voluntarily, and that he was not advised of his *Miranda* rights before giving his third statement.
>
> To establish a valid waiver of a defendant's *Miranda* rights, "'the state must present evidence sufficient to demonstrate that the accused understood that he did not have to speak, that he had the right to the presence of counsel, and that

25

the state could use what he said in a later trial against him.'" *People v. Daoud*, 462 Mich. 621, 637; 614 NW2d 152 (2000) (citations omitted).  "The test of voluntariness is whether considering the totality of all the surrounding circumstances, the confession is the product of an essentially free and unconstrained choice by its maker, or whether the accused's will has been overborne and his capacity for self-determination critically impaired."  *People v. Peerenboom*, 224 Mich.App 195, 198; 568 NW2d 153 (1997) (internal quotations and citation omitted).  This Court defers "to the trial court's superior ability to view the evidence and witnesses and will not disturb its factual findings unless they are clearly erroneous."  *Id.*

In determining whether a statement is voluntary, a trial court should consider the following factors: the age of the accused; his lack of education or his intelligence level; the extent of his previous experience with the police; the repeated and prolonged nature of the questioning; the length of the detention of the accused before he gave the statement in question; the lack of any advice to the accused of his constitutional rights; whether there was an unnecessary delay in bringing him before a magistrate before he gave the confession; whether the accused was injured, intoxicated or drugged, or in ill health when he gave the statement; whether the accused was deprived of food, sleep, or medical attention; whether the accused was physically abused; and whether the suspect was threatened with abuse.  *People v. Cipriano*, 431 Mich. 315, 334; 429 NW2d 781 (1988).

The record discloses that defendant gave four different custodial statements during a three-day period after his arrest.  He was advised of his *Miranda* rights before the initial police interview.  Defendant initialed and signed the advice of rights form, appeared to understand his rights, waived those rights, and agreed to give a statement.  Although defendant was not readvised of his *Miranda* rights before he gave his third statement, the police are not required to give a suspect *Miranda* warnings each time he is questioned.  *People v. Littlejohn*, 197 Mich.App 220, 223; 495 NW2d 171 (1992); *People v. Godboldo*, 158 Mich.App 603, 605; 405 NW2d 114 (1986).  Defendant did not appear to be injured, in poor health, or under the influence of drugs or alcohol, and he had no problem talking or communicating.  Although defendant testified that he was injured, he agreed that he told the detectives that he did not have any emergency medical problem and that there were no visible bruises.  Defendant also agreed that his injuries did not prevent him from understanding what was occurring.  Defendant claimed that he was not offered any food during the interviews.  The trial court questioned the credibility of this claim, but observed that defendant admitted that he never told the officers he was hungry.  Also, defendant admitted that he was given water and a Coke, which he thought would "suffice," and was allowed to use the bathroom several times.  Defendant claimed that he was placed in a cell without a mattress and had not had any sleep, but there was no evidence

26

that he ever complained to the police about any discomfort. Defendant acknowledged that he was aware that he had a right to an attorney. Defendant was 19 years old and had prior experience with the criminal justice system. He had some college education and appeared to the trial court to be intelligent. Throughout the interview process, defendant was cooperative with the police and never indicated that he wanted to stop any of the interviews.

Giving the appropriate deference to the trial court's reasonable findings, and viewing the totality of the circumstances, the record establishes that defendant's statements were the product of his own free will. The trial court did not err in denying defendant's motion to suppress his statements.

*Jackson*, No. 260820, 2006 WL 2683726 at *1-2 (footnote omitted).

Under 28 U.S.C. § 2254(e)(1) of the AEDPA, the factual findings of the state courts are presumed correct unless rebutted by clear and convincing evidence. *West v. Seabold*, 73 F.3d 81, 83 (6th Cir. 1996). Thus, the Michigan Court of Appeals' decision in this case, that Petitioner's statements were made knowingly and intelligently, is presumed correct.

Here, Petitioner fails to establish that the state court determinations were contrary to, or an unreasonable application of, clearly established Supreme Court precedent. Petitioner was nineteen-years-old at the time and had some college education and past contacts with law enforcement. There is no indication in the record that Petitioner was in any way coerced into making the statements.

At the *Walker* hearing, Detective Palmer testified that, during the first interview, Petitioner did not appear to be injured, he appeared to be in good health, and he did not appear to be under the influence of alcohol or drugs. Detective Palmer said that Petitioner had no trouble communicating with the detectives. According to Detective Palmer, Petitioner was advised of his *Miranda* rights, and Petitioner signed a waiver. During the course of the interview, he was also given several opportunities to use the bathroom. Petitioner then gave a verbal and written

statement.  *See* section I-A, *infra*.


        Regarding the second statement, Petitioner remained in the interview room and was given water and a Coke.  Detective Palmer testified that when he returned to ask Petitioner further questions, Petitioner was very cooperative and had no problem answering more questions.  Petitioner again gave another oral as well as written statement.  *See* section I-B, *infra*.

        Petitioner was then housed in the county jail and was given three meals.  He was brought back the next day, to be re-interviewed, because Detective Palmer had received more information that conflicted with Petitioner's statements.  Again, Petitioner had no problem talking with the detectives, and he, once again, made a verbal statement, his third, and reduced it to writing as well.  Petitioner was never promised anything nor was he threatened during any of the interviews.  And, at no time during the interviews did Petitioner indicate that he wanted to stop answering questions.  *See* section I-C, *infra*.

        In regard to Petitioner's fourth statement, Detective Schneider said that he once again read Petitioner's rights to him; Petitioner read them back and signed the form.  He said that he would be willing to answer questions.  Detective Schneider said that, during the course of his interview with Petitioner, he did not make any threats or promises, nor did he use any force or coercion.  He said that there was nothing to indicate that Petitioner had been deprived of medication, sleep, or food.  He did not appear to be intoxicated or under the influence of any other substance.  He did not appear to have been injured.  Nor did Petitioner complain that he was tired and could not answer the detective's questions.  Rather, Detective Schneider said that he appeared to understand everything that was being said to him.  *See* section I-D, *infra*.

28

Against that backdrop, the Court concludes that Petitioner's statements were properly admitted. Therefore, the Court finds that the Court of Appeals' decision is not contrary to, or an unreasonable application of, clearly established Supreme Court precedent. Petitioner is not entitled to habeas relief regarding this claim.

### B. Prosecutorial Misconduct

In Petitioner's second claim, he alleges various instances of prosecutorial misconduct. The Michigan Court of Appeals, issuing the last reasoned decision regarding this claim, stated:

> Defendant also argues that the prosecutor's conduct denied him a fair trial. Prosecutorial misconduct issues are decided case by case. *People v. Schutte*, 240 Mich.App 713, 721; 613 NW2d 370 (2000). This Court considers the prosecutor's conduct in context to determine whether it denied the defendant a fair and impartial trial. *People v. Reid*, 233 Mich.App 457, 466; 592 NW2d 767 (1999).
>
> Defendant argues that the prosecutor improperly vouched for the testimony of the detectives. A prosecutor may not vouch for the credibility of a witness by suggesting that he has some special knowledge that the witness is testifying truthfully. *People v. Bahoda*, 448 Mich. 261, 276; 531 NW2d 659 (1995). But a prosecutor may argue from the facts that the defendant or another witness is worthy or not worthy of belief. *People v. Thomas*, 260 Mich.App 450, 455; 678 NW2d 631 (2004).
>
> Because defendant did not object to the prosecutor's remarks, he must demonstrate that the remarks constituted plain error and affected his substantial rights. *People v. Carines*, 460 Mich. 750, 763; 597 NW2d 130 (1999); *Schutte*, *supra* at 720. A plain error is one that is "clear or obvious." *Carines*, *supra* at 763. Viewed in context, it is not clear or obvious that the prosecutor was implying that either he or Detective Palmer had some special knowledge, unknown to the jury, of the truthfulness of Detective Palmer's belief that only defendant was involved in the murder of Brooks. Rather, the prosecutor's statements were made in the context of discussing the evidence presented at trial. The prosecutor was arguing that the evidence at trial showed that only defendant was involved in Brooks's murder. There was no plain error. To the extent that the remarks could be interpreted differently, reversal is not warranted because a timely instruction could have cured any perceived prejudice. *Schutte*, *supra* at 721. Indeed, the trial court instructed the jury that it was to "only consider the evidence that has been properly admitted" and that "[t]he lawyers' statements and

29

their arguments . . . are not evidence." These instructions were sufficient to protect defendant's substantial rights.

Defendant also argues that the prosecutor tried to sway the jury with sympathy for the victim. Again, defendant's failure to object to the prosecutor's remarks limits our review to plain error affecting defendant's substantial rights. *Carines*, *supra* at 763.

Appeals to the jury to sympathize with the victim constitute improper argument. *People v. Watson*, 245 Mich.App 572, 591; 629 NW2d 411 (2001). Here, the prosecutor's remarks were made in the context of discussing premeditation. It appears that the prosecutor was arguing that Brooks's suffering should have alerted defendant to the consequences of his actions, thus allowing defendant an opportunity for a second look, and that defendant's continued conduct in the face of this suffering showed that he was acting with a premeditated intent to kill. Although the prosecutor used strong language, a prosecutor properly may use strong and emotional language in making his argument so long as it is supported by the evidence. *People v. Ullah*, 216 Mich.App 669, 678-679; 550 NW2d 568 (1996). Thus, the prosecutor's remarks did not constitute plain error. Moreover, to the extent that the remarks could be construed as an improper appeal for sympathy, reversal is not warranted because a cautionary instruction could have cured any perceived prejudice had one been requested. *Schutte*, *supra* at 721. In fact, the trial court later instructed the jury that it "must not let sympathy or prejudice influence your decision in any way." This instruction was sufficient to cure any perceived prejudice.

*Jackson*, No. 260820, 2006 WL 2683726 at *2.

In dismissing Petitioner's claim, the Court of Appeals relied upon a state procedural bar–Petitioner's failure to timely object to the prosecutor's conduct at trial. Thus, Petitioner's prosecutorial claims are barred for review.

A state prisoner who fails to comply with a state's procedural rules waives the right to federal habeas review absent a showing of cause for noncompliance and actual prejudice resulting from the alleged constitutional violation, or a showing of fundamental miscarriage of justice. *Coleman v. Thompson*, 501 U.S. 722, 750-751 (1991). In this case, Petitioner does not allege ineffective assistance of counsel as cause to excuse his default. Even assuming that

30

Petitioner could establish that counsel erred by failing to object, he cannot establish that he was prejudiced as his claims of prosecutorial misconduct lack merit.

Prosecutorial misconduct must be so egregious as to deny the petitioner a fundamentally fair trial before habeas corpus relief becomes available. *Donnelly v. DeChristoforo*, 416 U.S. 637, 643-45 (1974). In this regard, "the touchstone of due process analysis . . . is the fairness of the trial, not the culpability of the prosecutor." *Serra v. Mich. Dep't of Corr.*, 4 F.3d 1348, 1355 (6th Cir. 1993) (quoting *Smith v. Phillips*, 455 U.S. 209, 219 (1982)). Specifically, the Sixth Circuit takes into account "the degree to which the remarks complained of have a tendency to mislead the jury and to prejudice the accused; whether they are isolated or extensive, whether they were deliberately or accidentally placed before the jury, and the strength of the competent proof to establish the guilt of the accused." *Hamblin v. Mitchell*, 354 F.3d 482, 494-95 (6th Cir. 2003). "Claims of prosecutorial misconduct are reviewed deferentially on habeas review." *Millender v. Adams*, 376 F.3d 520, 528 (6th Cir. 2004).

The inquiry is directed to deciding whether the state court's determination of the issue was an unreasonable application of clearly established federal law. *Frazier v. Huffman*, 343 F.3d 780, 791 (6th Cir.), *as amended on reh'g*, 348 F.3d 174 (2003), *cert. denied*, 124 S.Ct. 1825 (2004); *United States v. Payne*, 2 F.3d 706, 715-16 (6th Cir. 1993) (inflammatory remarks in opening and closing statements and throughout trial were not cured by cautionary instructions); *United States v. Roberts*, 986 F.2d 1026, 1031 (6th Cir. 1993) (closing argument that appeals to the community conscience was cured by instructions). The giving of cautionary instructions also factors into the calculus of determining whether fundamental fairness was denied. *Serra*, 4 F.3d

31

at 1356.  Extensive prosecutorial misconduct during trial and during closing argument justifies

the granting of a writ of habeas corpus.  *Boyle v. Million*, 201 F.3d 711, 717 (6th Cir. 2000).

However, where the evidence pointing to the defendant's guilt is strong and the

prosecutor's improper comments go to the nature and intent of the crime, not to the defendant's

guilt or innocence of the crime, the improper comments may be "error, but the jury would

probably have returned the verdict of guilty anyway," and habeas relief is not warranted.

*Hamblin*, 354 F.3d at 495.

The Sixth Circuit has adopted a two-step approach in order to determine whether a

defendant is entitled to a new trial based upon improper prosecutorial remarks made in closing

argument.  *See United States v. Carroll*, 26 F.3d 1380, 1385-90 (6th Cir. 1994).  First, the court

should determine whether the remarks were improper by examining the context of the remarks

and existing precedent.  *Id.* at 1387-89.  Second, it should determine whether the remarks were

flagrant by applying the factors enunciated in *United States v. Leon*, 534 F.2d 667, 678-83 (6th

Cir. 1976).  Flagrancy is determined by an examination of four factors: 1) whether the statements

tended to mislead the jury or prejudice the defendant; 2) whether the statements were isolated or

among a series of improper statements; 3) whether the statements were deliberately or

accidentally before the jury; and 4) the total strength of the evidence against the accused.  *Id.  See

also Boyle*, 201 F.3d at 717 (quoting *Carroll*, 26 F.3d at 549, 550).  "[T]o constitute the denial of

a fair trial, prosecutorial misconduct must be 'so pronounced and persistent that it permeates the

entire atmosphere of the trial,' or 'so gross as probably to prejudice the defendant."  *Pritchett v.

Pitcher*, 117 F.3d 959, 964 (6th Cir. 1997).

The Michigan Court of Appeals in this case found no error in the instances of alleged prosecutorial misconduct outlined by Petitioner.  This Court agrees and finds that the Michigan Court of Appeals' decision is consistent with United States Supreme Court precedent and constitutes a reasonable application thereof.

Therefore, under the circumstances of this case, the prosecutor's conduct was not so egregious or flagrant as to deprive Petitioner of a fair trial.

The Supreme Court has held that application of the "miscarriage of justice" exception to the procedural default rule should apply only to cases where there is a likelihood of convicting a person who is actually innocent.  *Schlup v. Delo*, 513 U.S. 298, 321 (1995).  " '[A]ctual innocence' means factual innocence, not mere legal insufficiency."  *Bousley v. United States*, 523 U.S. 614, 623 (1998).  "To be credible, [a claim of actual innocence] requires [the] petitioner to support his allegations of constitutional error with new reliable evidence-whether it be exculpatory scientific evidence, trustworthy eyewitness accounts, or critical physical evidence-that was not presented at trial."  *Schlup*, 513 U.S. at 324.  Petitioner has not done so here.  In fact, Petitioner has pointed to no new evidence that the jury was not given.  Therefore, his procedural default will not be excused on this ground.  Thus, Petitioner's prosecutorial misconduct claims are procedurally defaulted and review of them is barred.

Accordingly, Petitioner is not entitled to federal habeas corpus relief with respect to his prosecutorial misconduct claims.

**IV.  Conclusion**

The state court decisions in this case were not contrary to federal law, an unreasonable application of federal law, or an unreasonable determination of the facts.  Petitioner has not established that he is presently in custody in violation of the Constitution or laws of the United States.

Accordingly, it is **ORDERED** that the petition for a writ of habeas corpus is **DENIED**.


s/Gerald E. Rosen_____
Chief Judge, United States District Court

Dated:  July 17, 2009

**CERTIFICATE OF SERVICE**

I hereby certify that on ___July 17, 2009____, I electronically filed the foregoing paper with the Clerk of the Court using the ECF system which will send notification of such filing to the following: _____Brad Beaver_____ ___, and I hereby certify that I have mailed by United States Postal Service the paper to the following non-ECF participants:
___Antoine Jackson, #367446, Carson City Correctional Facility, 10522 Boyer Road, Carson City, MI 48811_____.


s/Ruth A. Brissaud_____
Ruth A. Brissaud, Case Manager
(313) 234-5137

34